# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ROBERT F. MORAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 2025-0718-CDW |
| | ) | |
| UNATION, INC., | ) | |
| a Delaware corporation, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT GRANTING PLAINTIFF'S
## <u>MOTION FOR DEFAULT JUDGMENT</u>

Date Submitted:  October 21, 2025
Date Decided:  December 22, 2025

Richard Rollo, Travis S. Hunter, and Elizabeth J. Freud, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Robert A. Wilkins, LIGHTFOOT, FRANKLIN & WHITE LLC, Houston, Texas; *Counsel for Plaintiff Robert F. Moran*

**WRIGHT, M.**

This spring, in the shadow of the most sweeping changes to Section 220 in at least a generation, and perhaps since its 1967 codification, a corporation received a demand from its largest stockholder (and former CEO) seeking to inspect corporate records for the stated purposes of investigating potential mismanagement or wrongdoing and valuing the stockholder's shares. The corporation's founder and board chair pushed back hard, denying the propriety of the stockholder's purposes and refusing to produce any documents. The stockholder—like so many other jilted stockholders before him—filed a complaint in this court. But now, rather than pushing back hard, the corporation did nothing. It defaulted.

That default has consequences. In its 2019 opinion in *KT4 Partners, LLC v. Palantir Technologies, Inc.*, the Supreme Court sagely observed that a corporation's "good faith participation" in books-and-records litigation is critical to the proper functioning of the process contemplated by Section 220 of the Delaware General Corporation Law.[1] The reason why, the Supreme Court explained, is that the corporation "is likely to be the only participant in the settle-order process with knowledge of which corporate records are

---

[1] 203 A.3d 738, 756–57 (Del. 2019) (describing the Court of Chancery as "highly dependent" on this good faith participation).

relevant to the [stockholder's] proper purpose."[2]  So when a corporation fails

to participate in good faith in books-and-records litigation—including by not

participating at all—it inhibits this court's ability to determine if the

prerequisites for inspection under Section 220 have been met, including,

under its new amendments, finding by clear and convincing evidence that

specific records are necessary and essential to the stockholder's proper

purposes.

By failing to participate in good faith, the corporation has defaulted,

and the consequence of that default is that the court takes as true all of the

well-pleaded facts in the complaint and the reasonable inferences  drawn from

those facts.  Doing so, on this record, establishes all of the elements necessary

under our new Section 220 for an order that awards the stockholder nearly all

of the records sought.  The stockholder made a written demand under oath and

in good faith, he pleads proper purposes for inspection, he has established a

credible basis to investigate potential mismanagement or wrongdoing, the

demand identifies his purposes and the records he seeks with reasonable

particularity, the records demanded are specifically related to his stated

purposes, he is entitled to the functional equivalents of missing books and

---

[2] *Id.* at 757.

records where applicable, and he has demonstrated a compelling need for and established by clear and convincing evidence that certain additional records are necessary and essential for his stated purposes.

My reasoning follows.

## I.    FACTUAL BACKGROUND

The following facts are drawn from the allegations in the complaint,[3] the documents it incorporates by reference, and reasonable inferences arising from them. *See Hauspie v. Stonington P'rs, Inc.*, 945 A.2d 584, 586, 588 (Del. 2008).

### A.    The Parties

Defendant Unation, Inc. is a Delaware corporation with its principal place of business in Temple Terrace, Florida.[4] Unation operates an "events discovery" platform that allows users to discover, promote, and register and buy tickets for events in their area.[5] Plaintiff Robert F. Moran is Unation's largest outside stockholder[6] and served as Unation's Chief Executive Officer from 2021 until he resigned on April 5, 2025.[7]

---

[3] Dkt. 1 ("Compl.").

[4] Compl. ¶ 6.

[5] *Id.* ¶ 8.

[6] *Id.* ¶ 5.

[7] *Id.* ¶ 9; *id.* Ex. B at *1.

**B.      Moran and Unation Begin Their Relationship**

Moran became a Unation stockholder in November 2020, when he and Unation executed a Stock Purchase Agreement.[8]  Under the Stock Purchase Agreement, Moran purchased 416,666 shares for $6 per share.[9]  On April 22, 2021, Moran entered into a Chief Executive Employment Agreement with Unation, where Moran took on a full-time role as Unation's CEO.[10]  In exchange, Moran received an equity-based compensation package, including stock warrants.[11]

**C.      Moran Becomes Concerned About Unation's Performance**

Beginning in 2023, Unation, through John Bartoletta, Chairman of the Board of Directors, kept Moran in the dark about Unation's operations and financial state.[12]  Unation did not provide Moran—its own CEO—with "detailed financial statements, burn rates, plans to raise capital, capitalization tables, or other documents evidencing other funding sources.[13]  Despite making multiple requests, all Moran received were assurances.[14]  Unation

---

[8] *Id.* ¶ 10.

[9] *Id.*

[10] *Id.*, Ex. B at *1.

[11] *Id.*

[12] *Id.* ¶ 11.

[13] *Id.*

[14] *Id.*

claimed it was "financially stable, incredibly valuable, and would be profitable in the near future[,]"[15] but failed to substantiate these claims with any "objectively verifiable" evidence.[16]

Sometime later, Unation engaged in another equity offering, where it sold stock at an "'aggressive discount' of $3 per share."[17] Moran was concerned about the substantial reduction in share price, and that this additional offering "failed to include details about [Unation's] financial performance."[18]

## D. Moran Resigns and Seeks Documents

On April 5, 2025, Moran resigned from his position as Unation's CEO.[19] In conjunction with his resignation, Moran sent Bartoletta an initial request for books and records.[20] In that request, Moran sought "the past four years of audited financials, including balance sheets, [profit and loss statements], and cash flow statements, as well as [Unation's] current burn

---

[15] *Id.*

[16] *Id.* ¶ 12.

[17] *Id.* ¶ 13. The complaint does not specify when this transaction took place.

[18] *Id.*

[19] *Id.* ¶¶ 9, 15.

[20] *Id.* ¶ 15.

rate."[21]  Bartoletta responded to Moran's request five days later.[22]  Bartoletta disputed Moran's characterization of the circumstances leading to Moran's resignation and accused Moran of failing to fulfill his duties as CEO and meet certain performance objectives.[23]

On April 14, Moran followed up on his April 5 request and sought additional books and records.[24]  In his follow up, Moran asked to review the following documents:

1. Unation's Shareholder Agreement and/or LLC Agreement.

2. Unation's bylaws.

3. Any other corporate governance documents.

4. Unation's [capitalization] tables[25]—as they currently stand as well as any changes over the last four years.

---

[21] *Id.* Ex. A Ex. 1 at 2.

[22] *See id.* Ex. B (document titled "Rebuttal Letter in response to [Plaintiff]'s Resignation Letter Date 4-5-2025" and dated April 10, 2025).

[23] *See id.* Ex. B at *1–2.

[24] *Id.* ¶ 17*; id.* Ex. A Ex. 2 at 1.

[25] A capitalization (or "cap") table is a document that explains the ownership structure of a company.  It provides a detailed breakdown of the company's equity ownership, including the types and amounts of securities issued, such as common stock, preferred stock, warrants, options, convertible securities, senior debt, and subordinated debt.  *See* Robert R. Keatinge and Ann E. Conaway, KEATINGE & CONAWAY ON CHOICE OF BUS. ENT. Appx. C-1 (2025 ed.); *Capitalization Table*, INVESTOPEDIA, https://www.investopedia.com/terms/c/capitalization-table.asp (last visited Dec. 22, 2025).

5. Unation's complete tax returns for all years of operation, including all exhibits and schedules.

6. All information that [Unation has] used to support corporate valuations over the previous two years.

7. Support for the valuation that resulted in the Company's "equity offering at an 'aggressive discount' of $3 per share."[26]

Bartoletta responded to Moran's second request by letter dated April 14.[27] In his letter, Bartoletta admonished Moran for resigning and then stated that Unation was "committed to acting in full compliance" with the law including "responding appropriately to shareholder requests for information[.]"[28]

## E. Moran Submits His Inspection Demand to Unation

On May 2, Moran served his demand to inspect 12 categories of Unation's books and records ("Demand") on Unation's Chairman (Bartoletta), its chief operating officer, and its chief financial officer.[29] Moran stated he sought to inspect these records to value his investment in Unation, and to investigate possible "mismanagement, waste, or wrongdoing[.]"[30]

---

[26] Compl. Ex. A Ex. 2 at 1.

[27] *Id.* Ex. C at *1.

[28] *Id.* Ex. C at *2.

[29] *Id.* ¶ 18. *See also id.* Ex. A at *1 (address block). Moran later served the Demand on Unation's registered agent. *Id.* ¶ 18.

[30] *Id.* ¶ 20*; id.* Ex. A at *7.

Bartoletta responded to the Demand by letter dated May 13.[31] Bartoletta disputed Moran's claim that he "'never received financial[]'" statements,[32] attacked Moran's performance as CEO,[33] and rejected the Demand as "procedurally and substantively improper."[34] Bartoletta concluded his response by stating Unation reserved the right to pursue claims against Moran related to his role as CEO and his stock purchase, including claims for breaches of fiduciary duty.[35]

## II. PROCEDURAL POSTURE

On June 24, Moran filed his complaint.[36] On June 27, Moran's counsel served the summons and complaint on Unation.[37] On July 8, Bartoletta emailed Moran's counsel in response to receiving the complaint.[38] Bartoletta told counsel that he had "'submitted [Unation's] sealed response" to the court.[39]

---

[31] *Id.* ¶ 22*; id.* Ex. D at *1.

[32] *Id.* Ex. D at *2.

[33] *Id.*

[34] *Id.*

[35] *Id.* Ex. D at *4–5.

[36] *See id.*

[37] Dkt. 4.

[38] Dkt. 8 ¶ 4.

[39] *Id.* Moran says he never received the materials Bartoletta referenced in the response. *Id.* The filing never reached the docket either. The reason why is that

On July 28, Moran filed the Motion for Default Judgment.[40] Moran served the motion on Unation the next day.[41] On September 5, the court scheduled a hearing on the motion for October 7.[42] On October 1, the court cancelled the hearing due to a scheduling conflict.[43] On October 2, the court rescheduled the hearing for October 17.[44] On October 9, Moran served Unation with a notice of the hearing for the new hearing date.[45]

On October 15, Bartoletta emailed court staff to request a postponement of the hearing, claiming that a postponement was necessary to accommodate ongoing personal medical issues and to allow him to retain Delaware counsel for Unation, which he claimed was underway. The court declined to postpone the hearing but converted it to a Zoom hearing so that Bartoletta could attend and observe. The court also stated that if Unation obtained Delaware counsel

---

the Register in Chancery properly rejected the filing, explaining to Bartoletta that Unation cannot appear in this action without a lawyer. *See* File & ServeXpress Transaction No. 76610346 (explaining "You have to have counsel represent Unation, Inc. . . . [T]he filer cannot speak on behalf of Unation, Inc.").

[40] Dkt. 8.

[41] Dkt. 10.

[42] Dkt. 12.

[43] Dkt. 15.

[44] Dkt. 16.

[45] Dkt. 22.

before the hearing, the court would permit counsel to represent Unation at the hearing.

On October 17, the court held the hearing.[46] Present at the hearing were Moran's counsel and Bartoletta.[47] Following Moran's presentation, the court asked Moran's counsel to provide more information via letter by October 24.[48] On October 21, Moran's counsel filed a letter responsive to the court's request.[49] I consider the matter under submission as of that date.

## III.  ANALYSIS

Moran submitted his Demand to Unation on May 2, 2025, five weeks after Governor Meyer signed into law Senate Substitute No. 1 to Senate Bill No. 21 ("SB 21").[50] Section 2 of SB 21 is a set of amendments to Section 220 of the Delaware General Corporation Law that substantially revise the entire process—including litigation—for stockholder demands to inspect and copy a corporation's records.[51] These amendments impact the scope of the relief

---

[46] Dkt. 23.

[47] *Id.*

[48] *Id.*

[49] Dkt. 24.

[50] *See* 85 Del. Laws ch. 6.

[51] Litigation challenging the constitutionality of other parts of SB 21 is on appeal to the Delaware Supreme Court, with oral argument *en banc* having taken place on November 5, 2025. *See Rutledge v. Clearway Energy Grps., LLC*, No. 248, 2025 (Del. Supr.) ("*Rutledge*"), Dkt. 62.  The briefing in *Rutledge* shows that the

the court can grant for any books and records request under Section 220, so I pause to describe Section 220, as amended, before proceeding to consider the motion.

Under Section 220(b), a stockholder seeking to inspect corporate records must submit a "written demand under oath."[52] If the stockholder seeks corporate records beyond the stock ledger or list of stockholders, Section 220(b) says three other things must also be true.[53] First, the demand must be "made in good faith and for a proper purpose."[54] Second, the demand must

---

challenge targets sections 1 and 3 of SB 21—the amendments to 8 *Del. C.* § 144 and SB 21's retroactivity language, respectively. *See Rutledge*, Dkts. 9, 15, 27, 30, 44, 47, 48, 56, 58. Moran sent the Demand on May 2, 2025, after Governor Meyer signed SB 21 into law on March 25, so neither section 1 nor the retroactivity language in section 3 is at issue here. *See* 85 Del. Laws ch. 6, § 3 ("Sections 1 and 2 of this Act take effect on the enactment of this Act and apply to all acts and transactions, whether occurring before, on, or after the enactment of this Act[.]"). The Supreme Court's disposition of the appeal should therefore not impact the amendments to Section 220, at least as they apply to demands, like Moran's, made after Governor Meyer signed SB 21 into law, because section 1 and the retroactivity language in section 3 appear to be severable. *See Newark Landlord Ass'n v. City of Newark*, 2003 WL 22724663, at *2 (Del. Ch. Nov. 17, 2003) ("The valid segment of the statute or ordinance may stand alone, however, when severance of the invalid provision results in 'a residual component having separate purpose and independent legislative significance.'") (quoting *Matter of Oberly*, 524 A.2d 1176, 1182 (Del. 1987)); *see also* 1 *Del. C.* § 308 ("If any provision of this Code or amendments hereto . . . is held invalid, such invalidity shall not affect . . . such amendments that can be given effect without the invalid provisions or application, and to this end the provisions of this Code and such amendments are declared to be severable.").

[52] 8 *Del. C.* § 220(b)(1).

[53] Section 220(b)(2) is a new addition to Section 220 made by SB 21. *See* 85 Del. Laws ch. 6 § 2.

[54] 8 *Del. C.* § 220(b)(2)a.

– 11 –

describe "with reasonable particularity the stockholder's purpose and the books and records the stockholder seeks to inspect."[55] Third, the "books and records" the stockholder seeks to inspect must be "specifically related to the stockholder's purpose."[56]

If the corporation refuses to permit inspection or does not reply to the demand within five business days, Section 220(c) allows the stockholder to then file suit seeking an order to compel that inspection, and if the stockholder proves that they are a stockholder and that they have met Section 220(b)'s requirements, the court may order the production of nine categories of statutorily defined "books and records."[57] If the stockholder proves they have satisfied Section 220(b)'s requirements but the corporation does not have certain categories of "books and records"—specifically, minutes of stockholder, board, or board committee meetings; written consents evidencing stockholder action without a meeting; annual financial statements; or director independence questionnaires (for publicly held corporations)—the court may order the corporation to produce the "functional equivalent" of the missing

---

[55] 8 *Del. C.* § 220(b)(2)b.

[56] 8 *Del. C.* § 220(b)(2)c.

[57] 8 *Del. C.* § 220(c). Section 220(c) also adds a requirement that the stockholder establish the inspection is for a proper purpose, but this is redundant with Section 220(b)(2)'s requirement that the demand be "in good faith and for a proper purpose." *Compare* 8 *Del. C.* § 220(b)(2)c., *with* 8 *Del. C.* § 220(c)(3).

books and records, but "only to the extent necessary and essential to fulfill the stockholder's proper purpose."[58]

If a stockholder wants more than this—if they seek to inspect corporate records beyond the stock ledger, list of stockholders, and the statutorily defined "books and records" (or their functional equivalents in certain cases)—the stockholder has a heavier burden. First, the stockholder must satisfy Section 220(b).[59] Second, the stockholder must show a "compelling need" to inspect these additional corporate records.[60] Third, the stockholder must show by "clear and convincing evidence" that "such specific records are necessary and essential to further such purpose."[61]

The procedural posture of this case—a motion for default judgment—adds another layer to the court's analysis.[62] Under Court of Chancery Rule 55, when a party "has failed to appear, plead, or otherwise defend" the court

---

[58] 8 *Del. C.* § 220(f).

[59] 8 *Del. C.* § 220(g)(1). *See also supra* nn.50–56 (describing the requirements of Section 220(b)).

[60] 8 *Del. C.* § 220(g)(2).

[61] 8 *Del. C.* § 220(g)(3).

[62] As described in the Part I of this Report, Moran served the complaint on Unation on June 27, 2025. *See* Dkt. 4. Unation was required to serve an answer or file a responsive motion by July 17. *See* Ct. Ch. R. 12(a)(1)(A); Dkt. 4. No counsel appeared on behalf of Unation, and Unation did not respond to the complaint in the 112 days between being served and the hearing. Dkts. 4, 23. Moran then moved for entry of default judgment under Court of Chancery Rule 55. Dkt. 8.

may enter judgment for the moving party.[63]  "The effect of a default [is] . . . to deem admitted all the well-pleaded facts in the complaint." *Hauspie v. Stonington Partners, Inc.*, 945 A.2d 584, 586 (Del. 2008) (collecting cases). A movant is only entitled to a default judgment if those facts state a claim upon which relief can be granted. *Id.* at 586 (citing *Nishimatsu Constr. Co. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975)).  But "[a] default is not treated as an absolute confession by the defendant of his liability and of the plaintiff's right to recover . . . .  Although he may not challenge the sufficiency of the evidence, [the defendant] is entitled to contest the sufficiency of the complaint[.]" *Id.* at 587 (quoting *Nishimatsu*, 515 F.2d at 1206).  To that end, "entry of a default judgment requires strict conformity with all procedural requirements," including heightened pleading standards when they apply. *Id.* at 587 (collecting cases).

With this procedural standard in mind, I now consider how the Demand fits within the new Section 220 framework created by SB 21, whether Moran is entitled to inspect and copy Unation's records, and, if so, which records.

---

[63] Ct. Ch. R. 55(b).

**A.** **Moran is Entitled to Inspect and Copy Unation's Records Because He Has Satisfied the Requirements of Section 220(c)**

Section 220(c), as explained above, describes the requirements to compel a corporation to produce books and records in response to a demand. To prevail in an inspection action, a plaintiff must show that they are a stockholder, that they complied with the requirements in Section 220(b), and that the defendant either refused to allow the plaintiff to inspect the records sought or failed to respond to the demand within five business days. *See* 8 *Del. C.* § 220(c). I address each of these in turn.

**1.** **The Allegations of the Complaint are Sufficient to Establish Moran is a Stockholder of Unation**

The complaint alleges that Moran is Unation's "largest stockholder,"[64] as does the Demand.[65] These allegations are enough, for purposes of a motion for default judgment, to satisfy Section 220(c)(1)'s requirement that Moran establish he is a stockholder of Unation.[66]

---

[64] Compl. ¶¶ 5, 10.

[65] *Id.* Ex. A. Included with the Demand is a copy of the Stock Purchase Agreement by which Moran acquired a portion of his shares, and correspondence purportedly from Unation that does not dispute Moran's stockholder status.

[66] 8 *Del. C.* § 220(c)(1); *see Hauspie*, 945 A.2d at 586.

**2. The Allegations of the Complaint are Sufficient to Establish that Moran Has Satisfied the Requirements in Section 220(b) for Demanding Inspection**

Section 220(c)(2) requires Moran to establish that he has complied with the form and manner requirements for demanding inspection of corporate books and records, which are set forth in Section 220(b). The allegations of the complaint are sufficient to establish that Moran has met his burden here.

**a. Moran Made a Written Demand Under Oath**

The complaint alleges that Moran submitted a written demand under oath to Unation,[67] and attaches that demand as an exhibit.[68] This satisfies the requirements of Section 220(b)(1).

**b. The Demand Was Made in Good Faith and for Proper Purposes**

The allegations of the complaint also show that the Demand was made in good faith. The complaint alleges that when Moran was Unation's CEO, he was "kept in the dark" about Unation's operations and was not provided financial statements, and that Unation never provided detailed information about its financial status to Moran or potential investors.[69] This is sufficient,

---

[67] Compl. ¶¶ 2, 18; 8 *Del. C.* § 220(a)(5) (defining "under oath").

[68] Compl. Ex. A.

[69] *Id.* ¶ 11.

on a motion for default judgment, to show that Moran made the Demand in good faith.

The allegations of the complaint also show that Moran has proper purposes for inspecting Unation's books and records. Section 220 defines a "proper purpose" as "a purpose reasonably related to a stockholder's interest as a stockholder." 8 *Del. C.* § 220(a)(2).[70] Delaware law recognizes a variety of purposes that are reasonably related to a person's interest as a stockholder, including valuing one's ownership interest and investigating possible waste, mismanagement, or breaches of fiduciary duty.[71] The Demand states that Moran's purposes are to value his stock holdings and investigate possible mismanagement.[72] This satisfies Section 220(b)(2)a.

### c. The Demand Describes Moran's Purpose and the Records Sought with Reasonable Particularity

As previously noted, newly incorporated into Section 220 is a requirement that a demand describe with "reasonable particularity" both the

---

[70] This definition of "proper purpose" is not new—it was relocated from the end of Section 220(b)(5) to new Section 220(a)(2). *See* 85 Del. Laws ch. 6.

[71] Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* ("Wolfe & Pittenger") § 9.07[e][1] (T. Brad Davey et al. eds., 2d ed., 2024) (collecting cases).

[72] Compl. Ex. A at *1.

stockholder's purpose and the books and records the stockholder seeks. 8 *Del. C.* § 220(b)(2)b.[73]

"When interpreting a statute, 'the fundamental rule is to ascertain and give effect to the intent of the legislature.'" *Tesla Inc. v. Del. Div. of Motor Vehicles*, 297 A.3d 625, 631 (Del. 2023) (quoting *Delmarsh, LLC v. Env't Appeals Bd.*, 277 A.3d 281 (Del. 2022)). "A threshold determination is 'whether the provision in question is ambiguous.'" *Reybold Venture Gp. IX, LLC v. Summit Plaza Shopping Ctr., LLC*, 2025 WL 658760, at *6 (Del. Ch. Feb. 28, 2025) (quoting *Dewey Beach Enter., Inc. v. Bd. of Adjustments of the Town of Dewey Beach*, 1 A.3d 305, 307 (Del. 2010)). This inquiry begins with the text. *Tesla*, 297 A.3d at 631. "A statute is ambiguous if 'it is reasonably susceptible of different conclusions or interpretations' or 'if a literal reading of the statute would lead to an unreasonable or absurd result not contemplated by the legislature.'" *LeVan v. Indep. Mall, Inc.*, 940 A.2d 929, 933 (Del. 2007) (quoting *Newtowne Vill. Serv. Corp. v. Newtowne Rd.*

---

[73] The concept of "reasonable particularity" in books and records actions is not entirely unfamiliar. The requirement arguably existed in Section 220 even before Section 220(b)(2)'s enactment. *See Benjamin v. Island Mgmt. Co.*, 267 A.3d 19, 32 n.33 (Conn. 2021) ("[Section 220] does not expressly limit inspection to records directly connected to the purpose advanced or require reasonable particularity in the demand, but Delaware courts have effectively adopted these requirements as part of the proper purpose requirement.") (citing *Sec. First Corp.*, 687 A.2d at 569 (Del. 1997)).

*Dev. Co.*, 772 A.2d 172, 175 (Del. 2001)).   "If a statute is plain and unambiguous, 'the court's role is limited to applying the literal meaning of the statute's words.'"  *Reybold Venture Gp.*, 2025 WL 658760, at *6 (quoting *1001 Jefferson Plaza P'rship, L.P. v. New Castle Cnty. Dep't of Fin.*, 695 A.2d 50, 52 (Del. 1997)) (cleaned up).

There are several rules courts follow when interpreting ambiguous statutes:

> [E]ach part or section [of a statute] should be read in light of every other part or section to produce [a] harmonious whole. Undefined words in a statute must be given their ordinary, common meaning. Additionally, words in a statute should not be construed as surplusage if there is a reasonable construction which will give them meaning, and courts must ascribe a purpose to the use of statutory language, if reasonably possible.

*Oceanport Indus., Inc. v. Wilm. Stevedores, Inc.*, 636 A.2d 892, 900 (Del. 1994) (citations omitted).   "'When a statute [or rule] has been applied by courts and state agencies in a consistent way for a period of years, that is strong evidence in favor of that interpretation.'" *Reybold Venture Gp.*, 2025 WL 658760, at *6 (quoting *State v. Barnes*, 116 A.3d 883, 890 (Del. 2015)).

The General Assembly did not define "reasonable particularity" in Section 220, and I am unaware of any court having construed this part of the new Section 220.  But this does not mean that the path forward is unlit, as

there are other authorities that provide some illumination as to what "reasonable particularity" means.

### i. Discovery to Establish Personal Jurisdiction Under Court of Chancery Rule 12(b)(2)

The first guiding beacon exists in caselaw evaluating when a plaintiff is entitled to discovery to establish a court's ability to exercise jurisdiction over a non-resident defendant.[74] To be entitled to jurisdictional discovery, a plaintiff must present "factual allegations that suggest with *reasonable particularity* the possible existence of the requisite contacts between the parties and the forum state . . . ." *Green Am. Recycling, LLC v. Clean Earth, Inc.*, 2021 WL 2211696, at *6 (Del. Super. June 1, 2021) (quoting *CLP Toxicology, Inc. v. Casla Bio Holdings LLC*, 2020 WL 3564622, at *15 (Del. Ch. June 29, 2020)) (emphasis added). When applying this test, courts have held that a plaintiff's allegations were reasonably particular if they "explain how discovery would provide the 'something more' needed to establish personal jurisdiction." *CLP Toxicology*, 2020 WL 3564622, at *15 (quoting *Toys "R" Us, Inc. v. Step Two, S.A.*, 318 F.3d 446, 456 (3d Cir. 2003)).[75] The

---

[74] Wolfe & Pittenger § 3.02 (collecting cases).

[75] The Third Circuit has used this test for over 30 years. *See Mellon Bank (East) PSFS, Nat'l Ass'n v. Farino*, 960 F.2d 1217, 1223 (3d Cir.1992).

purpose is to avoid "inappropriately condon[ing] a dragnet 'fishing expedition' unmoored from a good faith objective." *Green America Recycling*, 2021 WL 2211696, at *6 (quoting *CLP Toxicology*, 2020 WL 3564622, at *15).

Applying this language in the context of Section 220, a demand would satisfy the "reasonable particularity" requirement if it demonstrates how the books and records sought would satisfy the stockholder's stated purpose but prevent an overly intrusive fishing expedition or condone a request made in bad faith.

### ii. The Model Business Corporation Act

Another guide is the Model Business Corporation Act.[76] Section 220(b)(2) is nearly identical to Section 16.02(c) of the Model Act,[77] so the court looks to cases in the states that have adopted the Model Act for possible guidance.[78]

---

[76] MODEL BUS. CORP. ACT. (A.B.A. 2025), https://www.americanbar.org/content/dam/aba/administrative/business_law/corplaws/mbca-202504.pdf ("Model Act").

[77] *Compare* 8 *Del. C.* § 220(b)(2), *with* Model Act. § 16.02(c). The only differences are Section 220(b)(2)c.'s use of "specifically related to" instead of Model Act Section 16.02(c)(3)'s use of "directly connected with," and the Model Act's use of "shareholder" versus Section 220's use of "stockholder."

[78] There is commentary confirming that the Model Act was a reference point in the drafting of SB 21. *See* John Mark Zeberkiewicz and Brian Mammarella, *The DGCL's Newly Enacted Safe Harbor Procedures and Books and Records Regime*, 39 INSIGHTS: THE CORP. AND SEC. L. ADVISOR 6–7 (June 2025) (explaining that

As explained by the Connecticut Supreme Court, quoting an Illinois appellate court, "the particularity requirement . . . is a relative one, turning on the degree of knowledge that a movant in a particular case has about the documents he requests . . . . [T]he shareholder's request must be sufficient to apprise a [person] of ordinary intelligence what documents are required, depending on the facts and circumstances of each case." *Benjamin v. Island Mgmt. Co.*, 267 A.3d 19, 41–42 (Conn. 2021) (quoting *Sunlitz Hldg. Co., W.L.L. v. Trading Block Hldgs., Inc.,* 17 N.E.3d 715, 722 (Ill. Ct. App.), *appeal denied*, 21 N.E.3d 719 (Ill. 2014)).[79] The particularity requirement "directs a shareholder to express his purpose with sufficient particularity so that the reason for the inspection can be ascertained by the corporation, but that minute detail of purpose is not required." *Pagett v. Westport Precision, Inc.*, 845 A.2d 455, 463 (Conn. App. Ct. 2004).

---

paragraphs (a)(1) and (b)(4) of Section 220 are consistent with the corresponding provisions of the Model Act).

[79] *See also Parsons v. Jefferson–Pilot Corp.*, 426 S.E.2d 685, 691 (N.C. 1993) ("Whether a shareholder has described his purpose or the desired records with reasonable particularity necessarily depends upon the facts and circumstances of each case."). The North Carolina Supreme Court, noting that "no court has yet construed the 'reasonable particularity' requirement" following North Carolina's enactment of Section 16.02 of the Model Act, reached this conclusion after looking at how courts have interpreted the "reasonable particularity" requirement in Rule 34 of the Federal Rules of Civil Procedure. *Id.*

### iii. Rule 34 of the Court of Chancery Rules and the Federal Rules of Civil Procedure

Another source of illumination is the Court of Chancery Rules and the Federal Rules of Civil Procedure ("Federal Civil Rules"). Both include the term "reasonable particularity" in their respective Rule 34. *Compare* Ct. Ch. R. 34(b), *with* Fed. R. Civ. P. 34. Specifically, Rule 34 in each requires a party requesting the "[p]roduction of documents" from another party in discovery context to describe the individual items or categories of items sought with "reasonable particularity." Ct. Ch. R. 34; Fed. R. Civ. P. 34. The term has not appeared often in this court's decisions, and has yet to be defined when it has graced the pages of this court's opinions and orders.[80] But the Court of Chancery Rules are much like the Federal Civil Rules, and this court has often looked to the Federal Civil Rules to guide its interpretation of the Court of Chancery Rules,[81] so I will do the same.

---

[80] A Westlaw search for Delaware cases citing Court of Chancery Rule 34 show the term appearing in two opinions (*Gross v. Biogen Inc.*, 2021 WL 1399282, at *18 (Del. Ch. Apr. 14, 2021) (quoting the parties' pretrial order) and *Highland Select Equity Fund, L.P. v. Motient Corp.*, 906 A.2d 156, 166 n.47 (Del. Ch. 2006)) and one form of implementing order drafted and submitted by the parties (*In re Dura Medic Hldgs., Inc.*, 2022 WL 17884178, at *3 n.3 (Del. Ch. Dec. 22, 2022) (ORDER)).

[81] *See, e.g.*, *Terramar Retail Centers, LLC v. Marion #2-Seaport Tr. U/A/D June 21, 2002*, 2018 WL 6331622, at *9 n.53 (Del. Ch. Dec. 4, 2018) (citing *Plummer v. Sherman*, 861 A.2d 1238, 1242 (Del. 2004) ("Because the Court of Chancery Rules are patterned on the Federal Rules of Civil Procedure, it is appropriate to look to federal authorities for guidance.")).

Fortunately, federal case law on this subject is expansive. The United States Supreme Court interpreted this language in *Consolidated Rendering Co. v. Vermont*, when it granted certiorari to consider if documents sought in a discovery request were "described with the particularity required" in the Federal Civil Rules. 207 U.S. 541, 554 (1908). In *Consolidated Rendering*, the justices held that if a discovery request listed "books, papers, and correspondence . . . which related to the subject of the inquiry, and were described with reasonable detail," the listed documents should be produced. *Id.* at 554. The United States Supreme Court also expressly rejected the theory that an inquiring party must "designate each particular paper which is desired" because that "presupposes an accurate knowledge of such papers" which an investigating party would rarely, if ever, have. *Id.*

The justices further refined the definition in *Brown v. United States*. 276 U.S. 134 (1928). The issue presented in *Brown* was whether a discovery request that demanded "[a]ll letters or copies of letters, telegrams, or copies of telegrams, incoming and outgoing" for a period of three-and-a-half years, and discussing 18 topics, described the records sought with "reasonable particularity." *Id.* at 142–43. The justices distinguished the discovery request in *Brown* from a subpoena in *Hale v. Henkel*, which demanded a witness produce "all communications" between a corporation and six other

companies, all of its "reports and accounts[,]" and all letters it received from more than a dozen other companies from the date of its incorporation to the present. *Id.* at 142 (discussing *Hale v. Henkel*, 201 U.S. 43, 76–77 (1906)). The *Brown* court determined that the request described the records with reasonable particularity because it identified communications discussing a certain set of topics over a reasonable time period, unlike the expansive and unspecific subpoena in *Hale*. *Id.*

Federal courts continued to refine the term in light of the U.S. Supreme Court's guidance in *Consolidated Rendering* and *Brown* after the amendments to the Federal Civil Rules in 1970.[82] Now "a request for inspection . . . must designate the things [the litigant] wishes to inspect." 8B WRIGHT & MILLER'S FEDERAL PRACTICE & PROCEDURE ("Wright & Miller") § 2211 (3d ed. 2025). "Particularity of designation . . . is a matter of degree, dependent upon a pragmatic consideration of the circumstances in each case." *Id.*

The test is a relative one, based on the knowledge a movant has about the records they seek. *Id.* According to Wright & Miller, courts have found "generalized designation[s]" sufficient when the party seeking discovery

---

[82] *See generally* The Sedona Conference, *Primer on Crafting eDiscovery Requests with "Reasonable Particularity,"* 23 SEDONA CONF. J. 331, 341 (2022); 8B WRIGHT & MILLER'S FEDERAL PRACTICE & PROCEDURE § 2211 (3d ed., 2025).

cannot provide a more detailed description and the opposing party will "have no difficulty in understanding what is wanted." *Id.* (collecting cases) . "The goal [appears to be] that the designation be sufficient to apprise a person of ordinary intelligence what documents are required and that the court be able to ascertain whether the requested documents have been produced." *Id.*[83] It "does not require the impossible." *Id.*

The court also found one Delaware Superior Court case addressing the meaning of "reasonable particularity" under Rule 34 of the Superior Court Rules of Civil Procedure, and the court in that case relied upon an earlier edition of Wright & Miller to reach a similar conclusion about the scope of Rule 34's "reasonable particularity" requirement: "The accepted standard is whether a reasonable person would know what documents are referred to in the request." *Nat'l Union Fire Ins. v. Stauffer Chem. Co.*, 1990 WL 177572, at *2 (Del. Super. Nov. 9, 1990) (citing C. WRIGHT & A. MILLER, FEDERAL

---

[83] *See also Reagan-Touhy v. Walgreen Co.*, 526 F.3d 641, 649–50 (10th Cir. 2008) (applying the "ordinary intelligence" test to assess the breadth of discovery requests under Rule 34); *Cardenas v. Dorel Juv. Grp., Inc.*, 230 F.R.D. 611, 623 (D. Kan 2005) (holding document requests were not particular enough if they required "'the respondent either to guess or move through mental gymnastics'" to determine what documents "'may conceivably contain some detail . . . within the scope of the request.'") (quoting *Audiotext Comms. v. U.S. Telecom, Inc.*, 1995 WL 18759, at *1 (D. Kan. Jan. 17, 1995)); *Mailhoit v. Home Depot U.S.A., Inc.*, 285 F.R.D. 566, 571–72 (C.D. Cal. 2012) (stating a request is not "reasonably particular" if it "does not provide sufficient notice to the responding party of what should be considered responsive material" and may require the production of irrelevant materials).

PRACTICE AND PROCEDURE: CIVIL § 2211 at 631 (1970); 4A MOORE'S FEDERAL PRACTICE ¶ 34.07 at 34–42 (1990) (citing *Temple Univ. v. Salla Bros.*, 656 F. Supp. 97 (E.D. Pa. 1986))).

\* \* \*

Considering these authorities together, a single theme emerges: the "reasonable particularity" requirement does not impose a high threshold. So long as a demand enables the receiving corporation to understand why the stockholder seeks inspection and what sort of documents it needs to look for, the "reasonable particularity" requirement is satisfied. I adopt that standard here.

Applying this standard, I conclude that the well-pleaded facts in the complaint demonstrate that the Demand identifies with reasonable particularity why Moran seeks inspection and the records he seeks. As to the former, the complaint and the Demand adequately explain why Moran seeks inspection.[84] As to the latter, ten of the twelve categories of records identified in the Demand are plainly stated, either in the Demand itself[85] or as clarified by counsel during oral argument,[86] and Unation should have no difficulty

---

[84] *See* Compl. ¶¶ 11–16, 20*; id.* Ex. A at 1, 5.

[85] *See id.* ¶ 21*; id.* Ex. A at 5–6. This includes Categories 1–3, 5–6, and 9–12.

[86] *See id.* ¶ 21*; id.* Ex. A at 6. This is Category 4.

finding these documents. As for the remaining two categories of records (Categories 7 and 8), I find that they are stated with reasonable particularity. Both categories seek records used by Unation to support certain corporate valuations performed by Unation, so Unation should be well-positioned to know what records were used in the valuation process. It would be unreasonable to expect a stockholder who was not involved in performing those valuations to identify the records sought with any greater particularity.

### d. The Books and Records Sought in the Demand are Specifically Related to Moran's Stated Purposes

Section 220(b)(2) imposes a third requirement: the books and records sought must be "specifically related" to the stockholder's stated purpose(s).[87] This is another new and undefined addition to Section 220. It is unclear what "specifically related" means here and, as one commentator has noted, the uncertainty is magnified by Section 220(a) defining a "proper purpose" as "a purpose *reasonably related* to a stockholder's interest as a stockholder."[88] As with Section 220(b)(2)b.'s "reasonable particularity" requirement, I seek

---

[87] 8 *Del. C.* § 220(b)(2)c.

[88] Daniel Meyer, *Blunting the "Tools at Hand": Recent Developments in Delaware Books-and-Records Demand Law*, 33 UNIV. MIA. BUS. L. REV. 387, 398 n.40 (2025).

illumination from other jurisdictions to tease out the meaning of "specifically related" in Section 220(b)(2)c.

Turning first to the Model Act, I note that the Model Act uses slightly different language to describe how tightly the documents sought by a demand must relate to a stockholder's purpose. Section 220 uses the phrase "specifically related" while the Model Act uses "directly connected."[89] It is unclear why the General Assembly did this,[90] and one strain of statutory construction says I should ascribe intent to this drafting choice,[91] which counsels against relying on judicial interpretations of the Model Act's "directly connected." But our caselaw requires that courts give undefined words their "ordinary and common meaning[,]"[92] and there is at least one dictionary authority suggesting that "specific" and "direct" can be

---

[89] *Contrast* 8 *Del. C.* § 220(b)(2)c., *with* Model Act § 16.02(c)(3).

[90] A review of publicly available hearings and debate on SB 21 reflect no discussion of this specific language.

[91] *E.g.*, *Clark v. State*, 65 A.3d 571, 577–78 (Del. 2013) (quoting *Sussex Cnty. Dept. of Elections v. Sussex Cnty. Republican Cmte.*, 58 A.3d 418, 422 (Del. 2013)); *Dep't of Nat. Res. and Env't Control v. McGinnis Auto & Mobile Home Salvage, LLC*, 2019 WL 851935, at *5 (Del. Super. Feb. 21, 2019) (citing 2A SUTHERLAND STATUTORY CONSTRUCTION § 46:3 (7th ed.)), *rev'd on other grounds,* 225 A.3d 1251 (Del. 2020).

[92] *E.g.*, *Reybold Venture Gp.*, 2025 WL 658760, at *6 (quoting *Oceanport Indus.*, 636 A.2d at 900).

synonyms,[93] which counsels in favor of at least considering those authorities.[94]

The few judicial decisions construing the contours of "directly connected" have applied a soft standard, finding requested records to be "directly connected" to a stockholder's purpose if the records are "relevan[t]" to the purpose or there is a "correlation" between the two. *See, e.g.*, *Benjamin v. Island Mgmt., LLC*, 267 A.3d 19, 40 (Conn. 2021) ("the plain meaning of 'direct connection[]' . . . is more suggestive of relevance than indispensable need"), 41 (citing *Pagett*, 845 A.2d 455 for the proposition that records are "directly connected" to the stockholder's purpose when there was "a correlation" between the stated purpose and the documents requested). But the Connecticut Supreme Court reached this conclusion in *Benjamin* by considering and then rejecting what it described as Delaware's "strict necessity" test. 267 A.3d at 40 ("We recognize that Delaware applies a strict necessity test" and quoting *Sec. First Corp. v. U.S. Die Casting & Dev. Co.*, 687 A.2d 563, 569 (Del. 1997)).

---

[93] *Specific*, MERIAM-WEBSTER THESAURUS, https://www.merriam-webster.com/thesaurus/specific (last visited Dec. 22, 2025).

[94] "Because dictionaries are routine reference sources that reasonable persons use to determine the ordinary meaning of words, [courts] often rely on them for assistance in determining the plain meaning of undefined terms." *E.g.*, *Freeman v. X-Ray Assocs.*, 3 A.3d 224, 227–28 (Del. 2010).

The question this raises, then, is whether the use of "specifically related" in Section 220(b)(2)c. was intended by the General Assembly to mark a lowering of the threshold from our common law, which for more than three decades has held that a stockholder seeking inspection must show that the records sought are "essential and sufficient to the stockholder's stated purpose." *E.g.*, *Thomas & Betts Corp. v. Leviton Mfg. Co.*, 681 A.2d 1026, 1035 (Del. 1995).[95]  After all, one thing can "specifically relate" to another thing without being both "essential and sufficient" to the other thing.[96]  At the same time, I am aware of at least one case in which the court seems to have treated "specifically related" and "necessary and essential" as co-extensive. *See Doerler v. Am. Cash Exch., Inc.*, 2013 WL 616232, at *1 ("This evidence is sufficient for the Plaintiffs to receive books and records *specifically related* to the credible allegations of self[-]dealing with the corporation."), *6 ("[T]he

---

[95] *See also, e.g.*, *KT4 P'rs.*, 203 A.3d at 751–52 (Del. 2019) ("[T]he court must give the petitioner everything that is 'essential,' but stop at what is 'sufficient.'") (citing *Thomas & Betts*); *Sec. First Corp.*, 687 A.2d at 569 ("The plaintiff bears the burden of proving that each category of books and records is essential to the accomplishment of the stockholder's articulated purpose for the inspection.") (citing *Thomas & Betts*); *Lebanon Cnty. Emps.' Ret. Fund v. AmerisourceBergen Corp.*, 2020 WL 132752, at *24 (Del. Ch. Jan. 13, 2020) (quoting *Thomas & Betts* and *Palantir*).

[96] Consider, for example, a stockholder's request for five years of audited financials solely for the purpose of valuing their stock.  All five years of audited financials would seem to be "specifically related" to the purpose of valuing the stock, but fewer than all five years of audited financials may be necessary—*i.e.*, essential and sufficient— to perform the valuation.

– 31 –

Plaintiffs are entitled to inspect any documents that are *necessary and essential* to investigating the self[-]dealing transactions.") (Del. Ch. Feb. 19, 2013) (emphasis added).

Ultimately, I think the better reading of the General Assembly's inclusion of "specifically related" is that it was not meant to signal a change in our books-and-records law regarding a stockholder's obligation to establish that each category of the books and records requested is essential and sufficient to the stockholder's stated purpose.[97] Applied here, I find that the books and records identified in the Demand are specifically related to Moran's stated investigative and valuation purposes.

As noted above, Moran was Unation's CEO.[98] While serving as Unation's principal executive officer, Moran alleges Unation's board chair (Bartoletta) deliberately walled him off from internal decision-making processes, refused to provide him with financial records or other documents to review, and engaged in equity offerings at half the price Moran paid for his shares without providing "objectively verifiable" evidence to justify their value and support Unation's representations marketing its shares.[99]

---

[97] *Thomas & Betts Corp.*, at 1035.

[98] Compl. ¶ 9.

[99] *See generally* Compl.

Corporate officers owe fiduciary duties to the corporation they serve, just as directors do. *Metro Storage Int'l, LLC v. Harron*, 275 A.3d 810, 842 (Del. Ch. 2022) (citing *Gantler v. Stephens*, 965 A.2d 695, 708–09 (Del. 2009)). "The directors of Delaware corporations have 'the legal responsibility to manage the business of a corporation for the benefit of its shareholders owners.'" and our law likewise confers such obligation on a corporation's officers. *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 101 (Del. 2007) (quoting *Malone v. Brincat*, 722 A.2d 5, 9 (Del. 1998); *see Harron*, 275 A.3d at 842. For Unation's Chairman to deny its CEO even basic financial or other information about the company, impacting his ability to discharge his fiduciary duties, is concerning.

The facts alleged describe conduct where Unation's Chairman and other company officials acted to preclude Moran from valuing his shares and from doing what Delaware law requires of him as an officer. The books and records sought by the Demand are specifically related to Moran's valuation and investigation purposes.

### 3. The Allegations of the Complaint are Sufficient to Demonstrate that Moran's Purposes for Seeking Inspection are Proper

Having found that the well-pleaded allegations of the complaint establish that Moran is stockholder,[100] and that Moran has satisfied Section 220(b)'s form and manner requirements,[101] I turn to the final thing a stockholder must establish under Section 220(c) before the court may order inspection: that the inspection is for a proper purpose. *See* 8 *Del. C.* § 220(c)(3). This element is redundant after the enactment of SB 21, because the Section 220(b)(2)a. already imposes this requirement,[102] and I have already found that the well-pleaded allegations of the complaint establish that the Demand states a proper purpose for inspection.

## B. Determining the Appropriate Scope of Production

Having found that the allegations of the complaint are sufficient to establish that meets the form and manner requirements of Section 220(c), I turn now to the scope of production. Section 220(e) states that a stockholder

---

[100] *See* Part III.A.1, *supra*.

[101] *See* Part III.A.2, *supra.*

[102] *Compare* 8 *Del. C.* § 220(b)(2) ("A stockholder may inspect and copy the corporation's books and records only if . . . a. The stockholder's demand is made in good faith and for a proper purpose."), *with* 8 *Del. C.* § 220(c) ("Where the stockholder seeks to inspect the corporations' books and records, other than its stock ledger or list of stockholders, such stockholder shall first establish that . . . (3) The inspection such stockholder seeks is for a proper purpose.").

is only entitled to "books and records" unless they satisfy the requirements of subsections (f) or (g). Because the court is granting inspection rights to Moran through a default judgment, the applicability of subsections (f) and (g) raise issues here that may not be present when a Section 220 case is fully litigated. There is also a risk of creating an adverse incentive for corporations not to participate in these proceedings if I conclude that the court cannot provide more relief than granting access to the statutorily defined books and records. This risk, however, must be balanced by the General Assembly's purpose in amending Section 220.

First, I will determine which of the category of records in the Demand are books and records under Section 220(a)(1), because there is no question that Section 220 authorizes me to require Unation to allow Moran to inspect statutorily defined books and records if the requirements of Section 220(c) are met, as I have held. Then I discuss the applicability of Section 220(f) and (g) to any categories of records not covered by Section 220(a)(1), and how to interpret and apply the heightened pleading requirements of Section 220(f) and Section 220(g) when a corporation has defaulted by failing to appear and defend.

**1. Moran is Entitled to Most of Unation's Statutorily Defined "Books and Records" Identified in the Demand**

One change made by SB 21 is to define a category of "books and records" that largely consists of board-level materials:

a. The certificate of incorporation, including any agreement or other instrument incorporated by reference in the certificate of incorporation.

b. The current bylaws, including any agreement or other instrument incorporated by reference in the bylaws.

c. Minutes of all meetings of stockholders and the signed consents evidencing all action taken by stockholders without a meeting, in each case for the three years preceding the date on which the stockholder demanded to inspect the books and records.

d. All communications in writing or by electronic transmission to stockholders generally within the three years preceding the date on which the stockholder demanded to inspect the books and records.

e. Minutes of any meeting of the board of directors or any committee of the board of directors and records of any action of the board of directors or any such committee.

f. Materials provided to the board of directors or any committee of the board of directors in connection with actions taken by the board of directors or any such committee.

g. Annual financial statements of the corporation for the three years preceding the

date on which the stockholder demanded to inspect the books and records.

h. Any agreement entered into under 8 *Del. C.* § 122(18), which authorizes agreements between the corporation and stockholders that grant those stockholders certain control rights.

i. Director and officer independence questionnaires.[103]

The Demand identifies twelve categories of records that Moran seeks to inspect. Seven of them are books and records under Section 220(a)(1). Unation must produce and make available the following categories of records identified in the Demand:

- The past three years of Unation's audited financials (Category 1).

- Unation's Shareholder Agreement (Category 2).

- Unation's bylaws (Category 3).

- Minutes of all meetings of Unation's stockholders and any signed consents evidencing action taken by the stockholders without a meeting within the past three years (Category 9).

- All communications in writing or by electronic transmission from Unation to the stockholders generally within the past three years (Category 10).

---

[103] 8 *Del. C.* § 220(a)(1).

- Minutes of any meeting of the board of directors or any committee of the board of directors and records of any action of the board of directors or any such committee (Category 11).

- Materials provided to the board of directors or any committee of the board of directors in connection with actions taken by the board of directors or any such committee (Category 12).[104]

Categories 11 and 12—minutes and other records of board and board committee meetings, and materials provided at board or board committee meetings in connection with action taken at board or board committee meetings—are unbounded by time. Based on the well-pleaded allegations of the complaint, which state that "[s]tarting in at least 2023," Unation was keeping Moran, its CEO, "in the dark with respect to details about [Unation's] strategic decisions, operations, [and] objective financial state,"[105] I find that Moran is entitled to minutes of any meeting of Unation's board or any committee of Unation's board, records of any action of the board or board committee, and materials provided to the board or any board committee in connection with actions taken by the board or board committee for the three years preceding the date of the Demand.

---

[104] Compl., Ex. A; 8 *Del C.* § 220(a)(1).

[105] *Id.* ¶ 11.

– 38 –

The remaining categories of the Demand (Categories 4 through 8) seek records that are not books and records under Section 220(a)(1),[106] and Category 1 seeks audited financials for more years than Section 220(a)(1) provides. Section 220(e), as previously noted, authorizes the court to order the production of corporate records outside of Section 220(a)(1)'s books and records only if a stockholder satisfies subsection (f) or subsection (g). *See* 8 *Del. C.* § 220(e). So I now consider whether subsections (f) and (g) of Section 220 allow me to order Unation to allow Moran to inspect records in any of these categories.

### 2. Moran is Entitled to Inspect Records that are the Functional Equivalent of Unation's Books and Records Under Section 220(f)

Section 220(f), as noted earlier in this report, states that if a corporation does not have four categories of books and records defined in Section 220(a)(1), the court may order the corporation to produce the "functional equivalent" of the missing Section 220(a)(1) books and records.[107] But the scope of the inspection is limited "only to the extent necessary and essential

---

[106] Category 4 of the Demand seeks "[a]ny other corporate governance documents." *Id.* Ex. A at 5–6. In a letter submitted after oral argument at the court's invitation, Moran clarified that Category 4 is intended as "a non-duplicative catch-all confined to the scope of Section 220(f)." Dkt. 24 at 1.

[107] 8 *Del. C.* § 220(f).

to fulfill the stockholder's proper purpose."[108]   The four categories are (1) minutes of stockholder, board, or board committee meetings; (2) written consents evidencing stockholder action without a meeting; (3) annual financial statements; and, for corporations with a class of stock listed on a national securities exchange, (4) director independence questionnaires.[109] Section 220(f) affects the Demand here in two ways.

First, Category 4 of the Demand, as clarified and limited by Moran after oral argument,[110] seeks production of the functional equivalents of records identified in Section 220(a)(1)c., e., or g., "including any document that (1) reflects deliberations, decisions, or actions of [Unation's] Board of Directors or any Board committee; (2) reflects deliberations, decisions, or actions of [Unation's] stockholders; or (3) pertains to or affects the valuation of [Unation]."[111]  Section 220(f) uses a conditional framework—if the records identified in Section 220(a)(1)c., e., or g. exist, I cannot order the production of their functional equivalents under Section 220(f).   Unation's choice to default—rather than participate—in this action impedes this determination.  I am left to assess if I can order the production of those functional equivalents

---

[108] *Id.*

[109] *Id.*

[110] Dkt. 24.

[111] *Id.*

in a factual vacuum because it cannot be known if Unation has the records identified in Section 220(a)(1)c., e., or g.

Second, four categories of records identified in the Demand (Categories 5 through 8) are not books and records under Section 220(a)(1): Unation's cap tables;[112] complete tax returns;[113] information used to support corporate valuations over the past two years;[114] and records supporting the valuation that resulted in Unation's "equity offering at an 'aggressive discount' of $3 per share."[115] Under Section 220(e), the court cannot order Unation to permit inspection of these materials unless either Section 220(f) or Section 220(g) applies. Here, I address whether Section 220(f) might apply, leaving my discussion of Section 220(g) for Part III.B.3 of this report.

### a. Moran is Entitled to an Order Authorizing Inspection of the Functional Equivalent Documents Sought by Category 4 of the Demand

Section 220(e) forbids the court from ordering "[a] corporation to produce any records . . . other than the books and records set forth in paragraph (a)(1)[,]" "[e]xcept as otherwise expressly provided in subsection

---

[112] Compl. Ex. A at 6 (Category 5).

[113] *Id.* (Category 6).

[114] *Id.* (Category 7).

[115] *Id.* (Category 8).

(f) or subsection (g)." 8 *Del. C.* § 220(e). As a result, I cannot simply order production of the requested "functional equivalent" Category 4 records without first finding that doing so is "necessary and essential" to Moran's proper purposes under Section 220(f). But Unation's default complicates things. Unation has denied Moran an opportunity to establish through discovery and trial that he is entitled to the functional equivalent documents contemplated by Category 4 because he cannot show Unation does not have the corresponding Section 220(a)(1) books and records.

One of the seemingly apparent purposes for SB 21's amendments to Section 220 is to discourage what some commentators have referred to as the "trench warfare" where corporations "take overly aggressive positions with no plausible basis in law" in response to legitimate stockholder inspection requests under Section 220.[116] The idea is to encourage corporations, in response to demands that meet Section 220(b)'s form and manner requirements, to produce—without the need for litigation—the core corporate records now defined in Section 220(a)(1).[117] If the stockholder and the corporation cannot agree on the production of additional corporate records,

---

[116] *See* Lawrence A. Hamermesh, et al., *Optimizing the World's Leading Corporate Law: A Twenty-Year Retrospective and Look Ahead*, 77 Bus. L. 321, 372 (Spring 2022).

[117] *Id.* at 376–78.

then subsections (f) and (g) of Section 220 provide potential avenues through which the court—through litigation—can determine if the stockholder has satisfied the evidentiary burdens needed to obtain those additional records.

What this process does not contemplate—and what it should not encourage—is gamesmanship by a corporation where, rather than retain counsel and defend a Section 220 action on the merits, the corporation simply defaults. Construing a corporation's default to mean that the court is only able to order the production of Section 220(a)(1)'s core board materials and nothing further because no trial has occurred would create undesirable incentives and could encourage corporations to continue the very sort of "trench warfare" SB 21 was intended to discourage.

The solution presents itself when the public policy considerations for granting default judgments are considered. Default judgments are a protective device, designed to shield a diligent party from "interminable delay and continued uncertainty as to [their] rights." *H.F. Livermore Corp. v. Aktiengesellschaft Gebruder Loepfe*, 432 F.2d 689, 691 (D.C. Cir. 1970). It also serves as a deterrent to parties who choose to delay or even boycott proceedings as a litigation strategy. *Id.* at 691. In the Section 220 context, as the Supreme Court has explained, this court is "highly dependent on the respondent's good faith participation in the process, because the respondent

– 43 –

is likely to be the only participant in the settle-order process with knowledge of which corporate records are relevant to the petitioner's proper purpose as determined by the court." *KT4 P'rs*, 203 A.3d at 757 . More generally, as this court has noted, "for the litigation system to function, parties must follow the rules." *In re Exam Works Gp., Inc. S'holder Appraisal Litig.*, 2018 WL 1008439, at *9 (Del. Ch. Feb. 21, 2018) (addressing discovery abuses).

The solution is to give effect to the default, "deem admitted all the well-pleaded facts in the complaint,"[118] and then determine if the well-pleaded facts in that complaint—and the reasonable inferences and conclusions to be drawn from them—establish there is reason to believe that the corporation does not have the books identified in Section 220(a)(1)c., e., or g., and that inspection of their functional equivalents is therefore necessary and essential to the stockholder's proper purpose. If so, then the stockholder is entitled to an order directing the corporation to produce the functionally equivalent records.

Doing that here, I conclude that the well-pleaded facts in the complaint, and logical inferences taken from those well-pleaded facts, show that there is reason to believe that Unation does not have the books and records identified in Section 220(a)(1)c., e., or g., and that production of their functional

---

[118] *Hauspie*, 945 A.2d at 586.

equivalents is, therefore, necessary and essential to fulfill the stated purposes for the Demand—valuing Moran's shares and investigating potential waste and mismanagement. The complaint adequately pleads that Moran, while serving as Unation's Chief Executive Officer, was routinely denied access to minutes, board materials, audited financials, and the other core board materials contemplated Section 220(a)(1). It is, I think, a fair inference that when a company denies its CEO these materials it is because some or all of those materials do not exist.[119] I will therefore enter an order directing Unation to produce the items sought by Category 4, as amended.[120]

[119] It is conceivable, of course, that Unation might possess core board materials like meeting minutes, executed stockholder consents, and audited financials, and is simply refusing to produce them out of spite, for perceived tactical advantage, or for any of a multitude of other reasons. But that is not the most logical inference. In any event, if these core board materials exist, the time for Unation to disclose their existence—and argue production of their functional equivalents is neither necessary nor essential—was when Moran (as CEO) first asked for them, when Moran submitted his Demand, when Moran filed his complaint, or when defending this action on its merits. Unation had four earlier opportunities to avoid the result it now brings on itself by defaulting.

[120] As for the meaning of "functional equivalents," I address that in the next section of this Report.

**b.** **The Records Identified in Categories 5–8 of the Demand Are Functional Equivalents of Annual Financial Statements, but not Meeting Minutes, Stockholder Consents, or Records of Board or Board Committee Action**

I turn now to considering if the Unation records identified in Categories 5 through 8 of the Demand—Unation's cap tables; complete tax returns; information used to support corporate valuations over the past two years; and records supporting the valuation that resulted in Unation's "equity offering at an 'aggressive discount' of $3 per share"—are the functional equivalents of meeting minutes, stockholder consents, records of board or board committee action, or annual financial statements. The term "functional equivalent"— like so many other new terms introduced by SB 21—was left undefined by the General Assembly. So, I must first define "functional equivalent" for purposes of Section 220(f).

Black's Law Dictionary ascribes several possible meanings for the word "functional," the two most salient of which are "[o]f, relating to, or involving the way in which something works or operates" and "[s]erving, or designed to serve, some particular purpose." *Functional*, BLACK'S LAW DICTIONARY (12th ed. 2024).[121] In turn, it defines "equivalent" as either

---

[121] *See also Functional*, CAMBRIDGE DICTIONARY ONLINE, https://dictionary.cambridge.org/us/dictionary/english/functional ("relating to the way in which something works or operates") (last visited Dec. 22, 2025).

"[e]qual in value, force, amount, effect, or significance" or "[c]orresponding in effect or function; nearly equal; virtually identical." *Equivalent*, BLACK'S LAW DICTIONARY (12th ed. 2024).[122]  Taken together, the words suggest something that serves the same or similar purpose or is intended to achieve the same or similar result as something else.

This results-oriented definition for "functional equivalent" is consistent with the term's use in our law.  For example, in *Tolson v. State*, our Supreme Court used the term to explain that an "interrogation" to which *Miranda* warnings apply "need not amount to actual questioning, but may be the functional equivalent of questioning."  900 A.2d 639, 643 (Del. 2006).  It explained that "functional equivalent" in this context means "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect"—a nearly identical test for determining if an interaction with the police is an interrogation.  *Id.* at 644.[123]

---

[122] The definition of "equivalent" has not changed much over the years.  *See Equivalent*, BLACK'S LAW DICTIONARY (6th ed. 1990) (defining the word as "[e]qual in value, force, measure, volume, power, and effect or having equal or corresponding import, meaning or significance; alike, identical.").

[123] The language is taken from the United States Supreme Court's opinion in *Rhode Island v. Innis*, 446 U.S. 291, 302 (1980).  *See Tolson*, 900 A.2d at 644 n.12 (citing *Upshur v. State*, 2004 WL 542164, at *1 n.5 (Del. Mar. 15, 2004) (quoting *Rhode Island*)).

This court has also used the term in cases to denote that two items are interchangeable in effect. *See, e.g.*, *In re Sears Hometown and Outlet Stores, Inc.*, 309 A.3d 474, 523 (Del. Ch. 2024). And the court used the term interchangeably with "functional alternative" to describe transactions that, while done through different methods, led to the same result. *See TW Servs., Inc. v. SWT Acquis. Corp.*, 1989 WL 20290, at *8–10 (Del. Ch. Mar. 2, 1989).[124]

The term also finds use in patent law, in the so-called "doctrine of equivalents" used to evaluate some claims for patent infringement. Lawrence M. Sung, *Pat. L. Handbook* § 3.13 (2025). A party can successfully invoke the doctrine of equivalents if the challenged device "performs substantially the same function in substantially the same way to obtain the same result." *Id.* (citing *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 608 (1950)).

---

[124] There are many other decisions from Delaware courts in which the term "functional equivalent" appears. The court has not attempted a complete survey, but a sampling confirms this general results-oriented approach. *See, e.g.*, *Gibson v. State*, 1993 WL 169133, at *2 (Del. May 12, 1993) (explaining how a variety of ordinary objects have been held to be the "functional equivalent" of a bludgeon "when used as such"); *In re P3 Health Grp. Hldgs., LLC*, 2022 WL 16548567, at *27 (Del. Ch. Oct. 31, 2022) (describing a de-SPAC merger as the functional equivalent of a traditional initial public offering because, like an IPO, it "is a way for an operating business to accomplish the twin goals of raising capital and accessing the public markets").

With this guidance in mind, I construe the term "functional equivalent" in Section 220(f) to mean that a document is the functional equivalent of meeting minutes, stockholder consents, records of board of board committee action, or annual financial statements if that document (1) contains or conveys, alone or combined with other documents, substantially the same information as meeting minutes, stockholder consents, records of board of board committee action, or annual financial statements and (2) would enable a reasonable individual reviewing that document to learn substantially the same things, come to substantially the same conclusions, or draw substantially the same inferences as that individual would have been able to do with the actual meeting minutes, stockholder consents, records of board or board committee action, or annual financial statements.

Using this definition, I do not believe that the items in Categories 5 through 8 of the Demand—Unation's cap tables; complete tax returns; information used to support corporate valuations over the past two years; and records supporting the valuation that resulted in Unation's "equity offering at an 'aggressive discount' of $3 per share"—are the functional equivalent of meetings minutes, stockholder consents, or records of board or board committee action. Such records would not ordinarily contain or convey, alone or combined with other documents, substantially the same information as

meeting minutes, stockholder consents, or records of board of board committee action and would not enable an individual to learn substantially the same things, come to substantially the same conclusions, or draw substantially the same inferences as the individual could do with the actual meeting minutes, stockholder consents, or records of board of board committee action.

What remains, then, is to determine if any of the items in Categories 5 through 8 are the functional equivalent of Unation's annual financial statements. I conclude, when read together, that they are.

### i. Information Commonly Contained in Financial Statements and Their Uses

The term "financial statements" is commonly understood to encompass four specific documents: the balance sheet, the income statement,[125] the cash flow statement, and the statement of owners' equity.[126]

***The Balance Sheet***. A balance sheet lists "the assets, liabilities and owners' equity (the investment of the [stockholders]) of a business as of a particular point in time."[127] The balance sheet typically includes two kinds of

---

[125] Also referred to as a profit and loss statement. *Income Statement*, BLACK'S LAW DICTIONARY (12th ed. 2024).

[126] *See* Charles H. Meyer, *Accounting and Finance for Lawyers* 1–16 (2d ed. 2002); Megan Drew, *Financial Statements: List of Types and How to Read Them*, INVESTOPEDIA (Jun. 15, 2025), https://www.investopedia.com/terms/f/financial-statements.asp; *Financial Statement*, BLACK'S LAW DICTIONARY (12th ed. 2024).

[127] Meyer, *supra* n.126, at 1–2.

assets.  The first type represents tangible or intangible property interests, or a legal right of the company, which commonly includes the company's cash and cash equivalents, receivables, inventories, real and personal property, and intellectual property.[128]  The second are deferred expenses/costs which are "cost[s] incurred by a business where the business expects to benefit from that cost over a period of time[,]" such as prepaid expenses (e.g., rent and utilities).[129]

Liabilities represent "the obligations of a [corporation] to persons other than" its stockholders.[130]  In other words "any money that a company owes to outside parties."[131]  Common liabilities include bills, loan payments, interest on bonds issued to creditors, rent, and salaries.[132] Similarly to assets, liabilities may also represent obligations that will come do in the future, or prepaid revenues collected before the company renders a service or delivers a good.[133]

---

[128] *Id.* at 2.  *See also* Jason Fernando, *Balance Sheet: Explanation, Components, and Examples*, INVESTOPEDIA (Oct. 17, 2025), https://www.investopedia.com/terms/b/balancesheet.asp.

[129] Meyer, *supra* n.126, at 2–3; Fernando, *supra* n.128.

[130] Meyer, *supra* n.126, at 3.

[131] Fernando, *supra* n.128.

[132] Meyer, *supra* n.126, at 3; Fernando, *supra* n.128.

[133] Meyer, *supra* n.126, at 4.  A balance sheet might also list "contingent liabilities" which are future obligations that may not ever need to be paid.  *Id.*

Lastly, Owners' Equity is money that is attributable to the contributions of stockholders combined with the accumulated income of the business that has not been distributed to the stockholders.[134]

> For corporations, the accounts in owners' equity typically include capital stock, representing the par or stated value of stock that has been issued, additional paid-in capital ["APIC"], representing the amount paid for stock in excess of its par or stated value, and retained earnings, representing the cumulative or running balance of the net income of the [corporation] less any distribution of dividends to the [stockholders].[135]

The balance sheet is often used to determine a corporation's financial health at a specific point in time.[136] It lists all the corporation's debt and can be used to determine the liquidity of its assets and its solvency.[137] Some important financial ratios are calculated from items on the balance sheet.[138] Valuation experts commonly refer to the balance sheet to determine the current value of assets, the mix of debt and equity ed by the corporation, and the current value of each.[139]

---

[134] *Id.* at 4–5.

[135] *Id.* at 5.

[136] Fernando, *supra* n.128.

[137] *Id.*

[138] *Id.*

[139] *See* Aswath Damodoran, *Investment Valuation* 30, 36 (3d ed. 2012); Meyer, *supra* n.126, at 6.

***The Income Statement***.  An income statement lists a corporation's revenues, costs, expenses, profits/gains, and losses for a specified period.[140] An income statement differs from a balance sheet in that it shows changes in accounts over time, whereas the balance sheet shows what a corporation owns and owes at the time it is prepared.[141]  The income statement commonly shows earnings per share calculations as well.[142]   Investors and analysts often rely on income statements to assess the profitability of a corporation its return on equity.[143]

***The Cash Flow Statement***.   A cash flow statement provides information about changes in a corporation's cash balance for a period covered by the income statement.[144]  The cash flow statement is meant inform a reader about "the sources from which cash is derived and how cash is used."[145]  A cash flow statement is usually divided into three sections.  The first shows cash flow from operating activities.  Operating activities normally

[140] Meyer, *supra* n.126, at 7; Jason Fernando, *Profit and Loss Statement: Meaning, Importance, Types, and Examples*, Investopedia (June 6, 2025), https://www.investopedia.com/terms/p/plstatement.asp.

[141] Fernando, *supra* n.140.

[142] Meyer, *supra* n.126, at 10; Damodoran, *supra* n.139, at 44–45.

[143] *See* Damodoran, *supra* n.139, at 42–43; Fernando, *supra* n.140.

[144] Meyer, *supra* n.126, at 11.

[145] *Id.*

include the corporation's revenue generating activities, such as making sales, and the amounts paid out for usual expenses, such as payroll.[146]

The second shows cash flow from investment activities. This includes cash received from buying and selling stocks and bonds, making and receiving loans, and buying and selling operating assets, like buildings, equipment, or patents and intellectual property.[147]

The final section shows cash flows from financing. This section provides an overview of the cash used in business financing and measures the cash flow between a corporation and its stockholders and creditors.[148] This section normally lists how much the amounts paid to stockholders as dividends and the amounts received through the issuance of bonds.[149]

Importantly, cash is not equivalent to income.[150] The cash flow statement usually begins with the net income value in the income statement and adjusts the value to reflect expenses and income that a corporation received in cash. The income statement typically calculates net income from

---

[146] *Id. See also* Fernando, *supra* n.140.

[147] Meyer, *supra* n.126, at 13; Fernando, *supra* n.140.

[148] *Id.*

[149] *Id.*

[150] Meyer, *supra* n.126, at 11.

accounts receivable that have not yet been paid to the business in cash.[151] So, for example, a company that makes many sales on credit but has not yet been paid for the sold inventory will have a lower revenue on its cash flow statement than on its income statement.

Cash flow statements can shed light on many of a corporation's activities. A corporation with a significant increase in investment expenditures can signal growth and investment in the future, while growth in investment revenue, like a sell off of critical equipment, could indicate slowing sales.[152] A negative cash flow from financing can indicate how much money the corporation pays in dividends or stock buybacks, which could indicate financial health and optimism about future performance.[153]

***Statement of Owners' Equity***. The statement of owners' equity summarizes the changes in stockholders' equity accounts for the period covered by the income statement.[154] The equity accounts shown are the

---

[151] *See* Meyer, *supra* n.126, at 11; Fernando, *supra* n.140.

[152] Fernando, *supra* n.140.

[153] *Id.*

[154] Meyer, *supra* n.126, at 10–11; Jeffrey J. Haas, *Corporate Finance in a Nutshell* 43 (2004).

capital stock paid at par value ("Capital Stock") account, APIC account, and the retained earnings account.[155]

The Capital Stock and APIC account will categorize stock in three ways. The first is authorized stock, which is the number of shares a corporation is authorized to issue in its certificate of incorporation or charter.[156] The second is authorized and issued stock, which list shares that a corporation has distributed. The third is authorized, issued, and outstanding stock. The third category is used when a corporation buys back stock it issued to stockholders, known as "treasury stock," but there are still shares in the hands of stockholders.[157] The shares currently held by stockholders are referred to as the outstanding stock.[158] The retained earnings account reflects a corporation's earned capital as listed on the balance sheet.

Valuation experts use the statement of owners' equity to measure a corporation's performance and profitability by demonstrating why a corporation's net assets changed year-over-year.[159] Under GAAP, the method

---

[155] Haas, *supra* n.154, at 43.

[156] *Id.* at 44.

[157] *Id.* at 44; Alicia Tuovila, *Treasury Stock (Treasury Shares): Definition, Use on Balance Sheets, and Example*, INVESTOPEDIA (June 2, 2024), https://www.investopedia.com/terms/t/treasurystock.asp.

[158] Haas, *supra* n.154, at 43.

[159] *Id.* at 42.

used to calculate the values on the statement of owners' equity reduce the volatility reflected in the income statement.[160]

### ii. The Information in Capitalization Tables and its Uses

A capitalization ("cap") table is a detailed breakdown of a corporation's ownership structure that outlines who holds equity and in what proportion.[161] Cap tables often include all of a corporation's capital, including common stock, preferred stock, options and warrants, restricted stock, and convertible instruments attributable to each stockholder.[162] Analysts often use information in a cap table to calculate the present value of stock based on the potential change in its value from options and warrants, restricted stock, and convertible notes.[163]

### iii. The Information Contained in Tax Returns and its Uses

Tax returns also contain relevant financial information. Domestic corporations are required to complete IRS Form 1120 with certain attached

---

[160] *See id.* at 45.

[161] Julie Young, *Capitalization (Cap) Table: What it Is and How to Create and Maintain One*, INVESTOPEDIA (July 2, 2025), https://www.investopedia.com/terms/c/capitalization-table.asp.

[162] *See id.*; *What is a Cap Table?*, CARTA (Nov. 6, 2025), https://carta.com/learn/startups/equity-management/cap-table/.

[163] Damodoran, *supra* n.139, at 442–46.

supplements.[164]   Form 1120 requires a filing corporation to include, among other things, its total income for the year, its expenses on certain categories, the method of accounting it uses to calculate its income, and its balance sheets dated at the beginning and end of the tax year.[165]   A corporate tax return may also include several supplements that list its ownership in foreign entities,[166] capital gains and losses from the corporations investments,[167] and information about equity holders who possess significant stock holdings.[168]

Tax returns are useful because they can reflect many important changes in a company.  For example, corporations can deduct the difference between market price and the exercise price of warrants and stock options when they are exercised.[169]   Important valuation metrics, such as free cash flows, are calculated using the information in tax statements.[170]

---

[164]   *See generally* IRS, *2024 Instructions for Form 1120* (2024), https://www.irs.gov/pub/irs-pdf/i1120.pdf.

[165] IRS, *Form 1120* (2024), https://www.irs.gov/pub/irs-pdf/f1120.pdf.

[166] *See* IRS, *Schedule N (Form 1120)* (2024), https://www.irs.gov/pub/irs-pdf/f1120sn.pdf.

[167] *See* IRS, *Schedule D (Form 1120)* (2024), https://www.irs.gov/pub/irs-pdf/f1120sd.pdf.

[168] *See* IRS, *Schedule G (Form 1120)* (2024), https://www.irs.gov/pub/irs-pdf/f1120sg.pdf.

[169] Damodoran, *supra* n.139, at 446.

[170] *See generally* Robert W. Holthausen & Mark E. Zmijewski, *Corporate Valuation Theory, Evidence & Practice* 115–133 (2d ed. 2019) (discussing the importance of

### iii. Information Used to Support Corporate Valuations

Unation records used to support valuations of Unation—over the past two years (Category 7) and for the equity offering at $3 per share (Category 8)—are the functional equivalent of annual financial statements. Financial statements themselves are, after all, a key component of any corporate valuation (if the documents exist).[171] So if a company has not prepared annual financial statements but somehow still purported to value itself, it is reasonable to infer that the company records used to support that valuation would contain or convey, alone or combined with other documents, substantially the same information as annual financial statements and would enable an individual to learn substantially the same things, come to substantially the same conclusions, or draw substantially the same inferences as the individual could do with the actual annual financial statements.

---

analyzing the impact of taxes on free cash flows); Damodoran, *supra* n.139, at 252–58, 847–48 (discussing the effect of tax rates on valuation).

[171] *See, e.g.*, *Rivest v. Hauppauge Digit. Inc.*, 2022 WL 3973101, at *20 (Del. Ch. Sep. 1, 2022) (collecting cases) (Where "a stockholder that wishes to value her shares usually seeks different types of documents[,] '[t]he invariable starting point is financial statements[.]'"); Shannon Pratt, *Valuing a Business* 67–71, 72–75 (6th ed. 2022) (discussing guidelines for collecting and using financial statements to value a business); *Bizzari v. Suburban Waste Servs.*, 2016 WL 4540292, at *7–8 (Del. Ch. Aug. 30, 2016); *Jefferson v. Dominion Hldgs., Inc.*, 2014 WL 4782961, at *1 (Del. Ch. Sep. 14, 2014).

I am satisfied, absent any opportunity to more narrowly define the scope of production due to Unation's default, that the combination of Unation's cap table, tax returns, and records used to generate corporate valuations are reasonably likely to contain or convey, as a group, substantially the same information as annual financial statements and would enable an individual to learn substantially the same things, come to substantially the same conclusions, or draw substantially the same inferences as the individual could do with the actual annual financial statements. Moran is therefore entitled to an order allowing him to inspect these records.

**3. Moran is Entitled to Inspect the Records Requested in Categories 5–8 of the Demand and a Fourth Year of Audited Financials Under Section 220(g)**

Having found that the records identified in Categories 5 through 8 of the Demand are not the functional equivalent of meeting minutes, stockholder consents, records of board or board committee action, or audited financial statements, and thus not some I can order inspection of under Section 220(f), I now consider whether Moran is entitled to inspect those records under Section 220(g). I must also determine if Moran is entitled to the fourth year of audited financials sought in Category 1 of the Demand, because Section

220(a)(1) limits audited financials to the three years preceding the date of a demand.[172]

Section 220(g) is, as one author has described it, a "safety valve" provision to permit a stockholder to inspect records not listed in subsection (a)(1).[173] The court may order inspection of "other specific records" under Section 220(g) if the following three things are true:

>    (1)    Such stockholder has met the requirements of subsection (b) of this section;
>
>    (2)    Such stockholder has made a showing of a compelling need for an inspection of such records to further the stockholder's proper purpose; and
>
>    (3)    Such stockholder has demonstrated by clear and convincing evidence that such specific records are necessary and essential to further such purpose.

8 *Del. C.* § 220(g). This short stretch of language introduces four more terms that Section 220 does not define: "compelling need"; "clear and convincing evidence"; "specific records"; and "necessary and essential." Each will be

---

[172] I did not consider whether I could order inspection of a fourth year of audited financial statements using Section 220(f)'s "functional equivalent" analysis because it seems self-evident that audited financial statements for one year cannot be the functional equivalent of audited financial statements for three other years.

[173] Daniel Meyer, *Blunting the "Tools at Hand": Recent Developments in Delaware Books-and-Records Demand Law*, 33 U. MIAMI L. REV. 387, 400 (2025).

addressed below as I address whether Moran is entitled to any records through Section 220(g).

### a. Moran Has Met the Requirements of Section 220(b)

In Part III.A.2 of this Report, I held that the Moran had complied with Section 220(b), so I need not address this element further.

### b. Moran Has Shown a Compelling Need for Inspection of the Documents in Categories 5–8 of the Demand and a Fourth Year of Audited Financials

Turning to the second element, I must determine the meaning of "compelling need" in Section 220(g)(2). I do so by borrowing from our State's case law on the discovery of opinion work product. In *Tackett v. State Farm Fire & Cas. Ins.*, the Supreme Court held that a party seeking discovery of opinion work product—work product disclosing the mental impressions or advice of counsel—must show that the information is "directed to the pivotal issue in the current litigation and the need for the material must be compelling." 653 A.2d 254, 262 (Del. 1995). It described this as something greater than the standard for obtaining discovery of non-opinion work product in Rule 26(b)(3), which requires a litigant to show "a substantial need" for the information and "an inability to obtain the substantial equivalent elsewhere" by other means. *Id.* In support of this finding, the *Tackett* court quoted

language from the United States Supreme Court that "we think a far stronger showing of necessity and unavailability by other means . . . would be necessary to compel disclosure" of opinion work product. *Id.* (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 401–02 (1981)).

I believe that the Delaware Supreme Court's articulation of "compelling need" in *Tackett* provides an appropriate framework here. When a stockholder seeks to inspect corporate records under Section 220(g)(2), the stockholder must establish that the records sought are pivotal to the stockholder's stated purpose and that the stockholder would not be able to obtain the information therein from Section 220(a)(1) books and records (or another source).[174]

Applying that standard here, in the context of Unation's default, I find that the well-pleaded facts of the complaint demonstrate a compelling need

---

[174] I am unconvinced the "compelling need" requirement in Section 220(g)(2) adds anything to a stockholder's burden that is not already imposed through Section 220(g)(3)'s separate requirement that a stockholder demonstrate by "clear and convincing evidence" that the specific records are "necessary and essential" to the stockholder's purpose. The Supreme Court has defined a "necessary and essential" document as one that "addresses the crux of the shareholder's purpose" and "is unavailable from another source." *Espinoza v. Hewlett-Packard Co.*, 32 A.3d 365, 371–72 (Del. 2011). And "crux" and "pivotal" are synonyms. *See, e.g., Crux*, DICTIONARY.COM, https://www.dictionary.com/browse/crux (defining "crux" as "a vital, basic, decisive, or pivotal point") (last visited Dec. 22, 2025). If the purpose is proper, the documents sought are necessary and essential to that purpose, and a stockholder shows that connection by clear and convincing evidence, I fail to see how a stockholder has not also established a compelling need for the records.

for Moran to inspect the documents in Categories 5 through 8 of the Demand and a fourth year of audited financials. As counsel aptly noted during argument, Unation's failure to appear has left Moran operating in a vacuum.[175] Unation has intentionally left Moran—both as CEO and stockholder—in the dark as to wide swaths of Unation's operations. And repeating a point I made in the "functional equivalents" portion of this Report (Part III.B.2), this decision to default must have consequences. By defaulting, Unation has denied Moran the opportunity this action was supposed to present him: to find out through discovery and trial if Unation even has the records he seeks and, if it does, meet his evidentiary burdens to obtain them. I am satisfied these facts establish a compelling need under Section 220(g)(2) for Moran to inspect the documents sought in Categories 5 through 8 of the Demand and a fourth year of audited financials (if audited financials exist).

        c.    **The Well-Pleaded Facts in the Complaint Provide Clear and Convincing Evidence That the Records in Categories 5–8 of the Demand and a Fourth Year of Audited Financials are Necessary and Essential to Moran's Purposes**

Turning now to the third element, I must determine the meaning of three terms in Section 220(g)(3): "clear and convincing evidence"; "specific

---

[175] Dkt. 26 at 44.

records"; and "necessary and essential." The first and third terms have well-understood meanings, but the second term does not.

### i. Clear and Convincing Evidence

Evidence is clear and convincing if it "produces an abiding conviction that the truth of the contention is highly probable." *Hudak v. Procek*, 806 A.2d 140, 147 (Del. 2002). "To establish proof by clear and convincing evidence means to prove something that is highly probable, reasonably certain, and free from serious doubt." *Id.* at 147 (citation omitted). "The clear and convincing evidence standard does not, however, require that the evidence negate all reasonable doubt or that the evidence must be uncontroverted." 29 AM. JUR. 2D *Evidence* § 170.

### ii. Specific Records

The adjective "specific" does not have a fixed, single meaning. "Specific" can be understood as requiring an exacting, "n-of-1" level of precision,[176] as a synonym for "unique."[177] Understood this way, the term

---

[176] *Specific*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/specific (last visited Dec. 22, 2025) ("restricted to a particular individual, situation, relation, or effect"); *see also Specific*, BLACK'S LAW DICTIONARY (6th ed. 1990) ("Precisely formulated or restricted; definite; explicit; of an exact or particular nature."); *Specific*, BLACK'S LAW DICTIONARY (12th ed. 2024) ("Of or relating to or designating a particular or defined thing; explicit.").

[177] *Specific*, MERRIAM-WEBSTER THESAURUS, https://www.merriam-webster.com/thesaurus/specific (last visited Dec. 22, 2025).

"specific records" would require a stockholder to establish and articulate to the court precise and extremely detailed information about what corporate records exist and can be ordered produced by the court if the high threshold of "clear and convincing evidence" is met. So, for example, the court would be limited to ordering production of a memorandum only if it could be identified by unique criteria, such as author, recipients, date, and subject line.

This exacting meaning of "specific records" would dramatically transform the litigation of Section 220 cases in our court.[178] If "specific records" means identifying unique, individual documents, stockholders will need to conduct extensive and intrusive discovery into the existence and location of a corporation's documents that are the subject of their inspection demand in order to make their showing to the court that (on a clear and convincing evidence standard) that those unique documents are necessary and essential to their proper purposes. The court has noted before that some discovery about what types of books and records exist and who has them is helpful in ruling on Section 220 demands,[179] but an exacting interpretation of

---

[178] *See, e.g.*, *KT4 P'rs.*, 203 A.3d at 754–55 ("Books and records actions are not supposed to be sprawling, oxymoronic lawsuits with extensive discovery. Rather, as the statutory text of § 220 itself reflects, the Court of Chancery is entitled to 'summarily order' an inspection.").

[179] *See AmerisourceBergen*, 2020 WL 132752, at *26 ("It is often helpful when ruling on a Section 220 demand to have information about what types of books and

---

"specific records" would explode this in a way that is inconsistent with the goals of reducing burdens on corporations in Section 220 cases and resolving these summary proceedings in the 60–90 days the court contemplates.[180]

But such exacting precision for "specific" is not the only way to interpret the word. "Specific" can also mean "so clearly expressed as to leave no doubt about the meaning."[181] In that sense, "specific" has a meaning similar to the noun form of "particular" ("particularity"), which in our law does not always require a uniform, inflexible, and exacting level of

---

records exist and who has them. The limitations on the scope of discovery in a Section 220 action exist to ensure that the parties do not expand a books-and-records action into a plenary proceeding, with the plaintiffs seeking discovery into the merits of future claims and the defendants seeking discovery into future defenses. But the parties can obtain discovery into the limited issues raised by the Section 220 proceeding . . . . The resulting record can assist the parties in resolving their dispute, and it later assists the court in crafting a tailored order."); *see also Pettry v. Gilead Sciences, Inc.*, C.A. No. 2020-0132-KSJM, Dkt. 70 at 57–58 (Del. Ch. May 8, 2020) (TRANSCRIPT) ("[I]t's a waste of both litigant and judicial resources to examine the question of scope of production in the abstract without the knowledge of what documents actually exist . . . . [I]nformation concerning the existence and whereabouts of documents sought in a 220 demand is certainly relevant and, again, also helpful.").

[180] *See* Hamermesh, et al., *supra* n.116, at 377 (arguing that Section 220 amendments need to find a balance that would "more efficiently enable the Delaware courts to satisfy legitimate plaintiffs' needs without subjecting companies to undue expense and overreach").

[181] *See Specific*, MERRIAM-WEBSTER DICTIONARY, https://www.merriam-webster.com/dictionary/specific (last visited Dec. 15, 2025).

– 67 –

precision.[182]  I use the term "precision" here deliberately, as the term "specific records" can, I believe, be interpreted as intending to reinforce—not replace—the level of specificity our Section 220 common law already says is required when this court orders production.  In this scenario, "specific records" codifies the prevailing requirement that the court's order granting inspection be "circumscribed with rifled precision,"[183] so that the stockholder receives only those records that are clearly and convincingly shown at trial to be necessary

---

[182] *See* Part III.A.2.c. (construing "reasonable particularity").  "Specific" and "particular" are synonyms.  *See Specific*, MERRIAM-WEBSTER THESAURUS, https://www.merriam-webster.com/thesaurus/specific (last visited Dec. 22, 2025).  "Particularity" is also the operative standard (without "reasonable") for allegations of fraud or mistake under Court of Chancery Rule 9(b), and for pleading demand futility under Court of Chancery Rule 23.1.  As Vice Chancellor Slights thoughtfully explained in *Elburn on Behalf of Invs. Bancorp, Inc. v. Albanese*, discussing Rule 23.1, particularity requires "some degree of specificity," but it does not require facts "sufficient to sustain a judicial finding."  2020 WL 1929169, at *7 (Del. Ch. Apr. 21, 2020).  "[C]ontext matters when assessing the adequacy of particularized pleading.  No rational pleading standard can require a plaintiff to plead specific facts that he has no means to know."  *Id.* at *8.  And even under Rule 9(b), an exacting level of precision is not always required.  A plaintiff "must allege the circumstances of the fraud with detail sufficient to apprise the defendant of the basis for the claim" and "lack of specificity as to date, place, and time [is] not fatal, provided that the pleadings put defendants on sufficient notice of the actual misconduct with which they are charged."  *LVI Gp. Invs., LLC v NCM Gp. Hldgs., LLC*, 2017 WL 1174438, at *4 (Del. Ch. Mar. 29, 2017) (quoting *Prairie Capital III, L.P. v. Double E Hldg. Corp.*, 132 A.3d 35, 49 (Del. Ch. 2015), and *Yavar Rzayev, LLC v. Roffman*, 2015 WL 5167930, at *4 (Del. Super. Aug. 31, 2015)).

[183] *Sec. First Corp.*, 687 A.2d at 570 ("A Section 220 proceeding should result in an order circumscribed with rifled precision.").

and essential to the stockholder's proper purposes.[184]   Specificity, like rifled precision, would thus require "a fact specific inquiry" which "can only be determined in the context of a specific case" and require the court to "make a qualitative analysis of the documents demanded."[185]

I find that this latter meaning for "specific records" is the one that better fits Section 220 as a summary proceeding and the spirit of SB 21's amendments to Section 220, so I adopt it here.

### iii.    Necessary and Essential

Our Section 220 case law teaches that documents are necessary and essential "if they address the 'crux of the shareholder's purpose' and if that information is 'unavailable from another source.'" *Inter-Loc. Pension Fund GCC/IBT v. Calgon Carbon Corp.*, 2019 WL 479082, at *16 (Del. Ch. Jan. 25, 2019) (quoting *Wal-Mart Stores, Inc. v. Indiana Elec. Workers Pension Tr. Fund IBEW*, 95 A.3d 1264, 1271 (Del. 2014)).  "'The inspection should

---

[184] *See Emps.' Ret. Sys. of Rhode Island v. Facebook, Inc.*, 2021 WL 529439, at *5 (Del. Ch. Feb. 10, 2021) ("[T]he court must tailor its order for inspection to cover only those books and records that are "essential and sufficient to the stockholder's stated purpose.") (quoting *Wal-Mart Stores, Inc. v. Indiana Elec. Workers Pension Trust Fund IBEW*, 95 A.3d 1264, 1278 (Del. 2014)); *see also KT4 P'rs*, 203 A.3d at 752 (Del. 2019) ("[T]he court must give the petitioner everything that is 'essential,' but stop at what is 'sufficient.'") (quoting *Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 775 (Del. Ch. 2016)).

[185] *Wal-Mart Stores, Inc. v. Indiana Elec. Workers Pension Tr. Fund IBEW*, 95 A.3d 1264, 1283 (Del. 2014).

stop at the quantum of information . . . sufficient to accomplish the plaintiff's stated purpose.'" *Inter-Local Pension Fund*, 2019 WL 479082, at *16 (quoting *Amalgamated Bank v. Yahoo! Inc.*, 132 A.3d 752, 788 (Del. 2016), *abrogated on other grounds*, 214 A.3d 933 (Del. 2019)). If the stockholder already has sufficient information to fulfill their stated purpose, the inspection can be denied for "seeking materials beyond what is 'needed to perform the task.'" *Yahoo! Inc.*, 132 A.3d at 788 (quoting *Carapico v. Phila. Stock Exch., Inc.*, 791 A.2d 787, 793 (Del. Ch. 2000)).[186]

\*          \*          \*

Considering Section 220(g) under these circumstances, I find that the facts alleged in Moran's complaint—which are deemed admitted by Unation on default—demonstrate by clear and convincing evidence that the records sought by Categories 5 through 8 and a fourth year of audited financials are necessary and essential to Moran's investigative and valuation purposes. To repeat what was noted earlier in this Report,[187] Moran was Unation's CEO but Unation's Chairman walled him off from internal decision-making processes,

---

[186] For example, if a Section 220 action is brought to evaluate a possible derivative suit, the documents that are necessary and essential are "those that are required to prepare a well-pleaded complaint." *Kaufman v. CA, Inc.*, 905 A.2d 749, 753 (Del. Ch. 2006).

[187] *See supra* Part I.C, Part III.A.2.d.

refused to provide him with financial records or other documents to review, and engaged in equity offerings at half the price Moran paid for his shares without providing "objectively verifiable" evidence to justify their value and support Unation's representations marketing its shares.[188] Conduct by Unation's Chairman and other company officials that prevented Moran from doing what Delaware law requires of him as an officer.

This, combined with the fact that Moran has no knowledge of or ability to find out what books and records Unation maintains, demonstrates a compelling need for the inspection. Absent Unation producing these documents, it appears there is no other way for Moran to obtain them. Further, if Unation had participated, then it would have had an opportunity to refute Moran's allegations. Giving Moran the rights listed in Section 220(g), in my view, creates the correct incentives for corporations to participate in Section 220 actions without subverting the General Assembly's determination that inspection of non-Section 220(a)(1) records requires stockholders to meet a higher burden. Moran is entitled to inspect the records listed in demand

---

[188] *See generally* Compl.

Categories 5 through 8 and to receive a fourth year of audited financials (if the audited financials exist).[189]

## IV.  CONCLUSION

Defendant Unation, Inc. was properly served with the complaint and summons in this Section 220 action, had ample notice of this action and plaintiff's motion for default judgment, and not appeared and defended.  I therefore recommend that judgment by default be entered in favor of plaintiff on the bases set forth in this report.  This is a final report.  Under Court of Chancery Rule 144(d), any party taking exceptions must file a notice of exceptions by January 2, 2026.

---

[189] The requirements imposed by Section 220(g)(2) and (3) are ones that a stockholder will ordinarily be able to try to meet through discovery and trial.  The demand itself does not need to establish the "compelling need" or identify the "clear and convincing evidence" establishing that records are necessary and essential.  This is, I think, plain from the text of Section 220(g), which begins "[i]n any proceeding brought by a stockholder . . . ."  8 *Del. C.* § 220(g).  The requirements for a demand are in Section 220(b), which are separately incorporated into Section 220(g) through paragraph (g)(1).